UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 05-278-01 (CKK) |
| | : | |
| RICO LEE THOMAS, | : | |
| MICHAEL LEN JACKSON, | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT RICO
THOMAS'S MOTION TO SUPPRESS STATEMENTS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's motion to suppress evidence. As grounds for this opposition, the United States relies on the following points and authorities as such other points and authorities as may be cited at a motions hearing.

**I.   FACTUAL BACKGROUND**

Defendant Thomas (who is currently 32 years old) is currently charged with Unlawful Possession of a Firearm by a Person Convicted of Crime Punishable by Imprisonment for a Term Exceeding One Year. These charges arose out of the defendant's joint and constructive possession of a .357 Smith and Wesson on June 29, 2005.

On Wednesday, June 29, 2005, at approximately 12:10 p.m., Metropolitan Poice Department Officers Gregory Phifer and Lamumba Howard were sitting in a marked MPD police cruiser in the 3600 block of Alabama Avenue, S.E. in the District of Columbia, preparing an accident report for an accident that had just occurred. As they sat at the accident scene, the officers heard the sound of screeching tires speeding towards the police cruiser and the other vehicles that had previously

collided during the accident. The police officers looked up and observed a 1990 White 2-door Mercury Cougar, approaching them at a high rate of speed. Upon observing the police cruiser and the other cars at the accident scene, the White Mercury Cougar started swerving back and forth and soon careened out of control, while trying to navigate around the accident scene. The White Mercury Cougar then crashed and jumped onto the sidewalk, nearly hitting several pedestrians who were walking on the sidewalk. The White Mercury Cougar, which was driven by defendant Rico Thomas, with defendant Michael L. Jackson in the front passenger seat, came to a complete stop just a few feet away from the marked police car. Officers Phifer and Howard ( both in full uniform) then approached the White Mercury Cougar and requested defendant Thomas's license and registration. Defendant Thomas handed Officer Phifer his driver's permit, then jumped over his car, and bolted. Simultaneously, defendant Jackson who exited the White Mercury from the front passenger seat, took off running too. Defendant Jackson did not get very far and was apprehended within seconds. Officer Howard chased defendant Thomas and apprehended him within one block. After Officer Howard apprehended defendant Thomas, defendant Thomas voluntarily and spontaneously stated that he ran because he was scared of the guy in the passenger seat of his vehicle (referring to defendant Jackson), who had just jumped into his vehicle with a gun. Officer Howard understood defendant Thomas's statement to mean that defendant Thomas had just been car jacked and kidnaped by defendant Jackson. Accordingly, Officer Howard radioed ahead to send backup for Officer Pfifer, who was still on the scene with the purported carjacker - - defendant Jackson. Based on his statement, Officer Howard believed and treated defendant Thomas as a victim and requested that defendant Thomas escort him back to the car accident scene. Once Officer Howard and defendant Thomas returned to the scene of the car accident, a detective arrived to interview

defendant Thomas about the carjacking. At this point, defendant Thomas changed his story and informed the detective that when he and defendant Jackson were somewhere else, someone stuck a gun through the passenger window in an attempt to carjack them. Defendant Jackson grabbed the carjacker's gun, then defendant Thomas sped off with defendant Jackson still holding on to the carjacker's gun.

The officers peered into the White Mercury Cougar and observed a .357 caliber Smith & Wesson handgun resting in plain view on the front passenger seat, where defendant Jackson had been sitting. The handgun had been at arms length of both defendants. Because the police officers did not find defendant Thomas's versions of events to be credible, both men were placed under arrest.

After defendant Thomas was brought down to the Sixth District Police Station for processing, Detective Tenina Trusdale read defendant Thomas his Miranda warnings. Defendant Thomas voluntarily waived his Miranda rights and executed the PD-47 rights card and agreed to give a videotaped statement.[1]

## II. ARGUMENT

### A. Defendant Thomas's Pre-Arrest Statements Were Voluntary

Defendant Thomas now moves to suppress his various statements, claiming that they were was obtained in violation of his "Fourth, Fifth, and Sixth Amendments and the Due Process Clause of the United States Constitution." Defendant Thomas's assertion lacks merit. At the time that the first statements were made, defendant Thomas was not in custody, arrested, nor was he being

---

[1] To date, the undersigned still has not been able to obtain a copy of the videotape statement and still does not know it's content. The undersigned will continue to make all efforts to provide the videotape to defense counsel before the motions hearing.

3

interrogated. Viewed in the totality of the circumstances, it can not be said that defendant Thomas's will was some how "overborne" by "coercive police activity." See Colorado v. Connelly, 479 U.S. 157, 167 (1986). There is no evidence that defendant's personal circumstances were such as to render his statements other than voluntarily given.

If a suspect is in custody, but volunteers a statement in the absence of interrogation, there is no Miranda issue even if the suspect was not given any advice of rights. Miranda, 384 U.S. at 478; Rhode Island v. Innis, 446 U.S. 291, 300 (1980). Miranda's requirements are equally inapplicable if a suspect is questioned by the police but not in "custody" at the time. See Beckwith v. United States, 425 U.S. 341 (1976). As the cases have made clear, the type of "custody" which requires police officers to provide a defendant with Miranda warnings involve circumstances where a defendant is "subjected to restraints comparable to those associated with a formal arrest." Berkemer v. McCarty, 468 U.S. 420, 441 (1984). This is an objective test, not subject to the idiosyncracies of a particular defendant's point of view; "the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation." Id. at 442. Determining whether certain circumstances amount to a "formal arrest" for Miranda purposes requires a focus on whether those circumstances are equivalent to what the Miranda warnings are designed to protect: situations equivalent to the police station house interrogation. See id. at 437-8 ("Fidelity to the [Miranda doctrine] . . . requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the [Miranda] decision are implicated. . . . questioning incident to an ordinary traffic stop is quite different from station house interrogation").

As stated above, the police chased defendant Thomas because he was fleeing the scene of an accident. Upon apprehending defendant Thomas, he voluntarily and spontaneously stated that he

4

fled because the passenger in the car had a gun. At that point, the police began to treat him as a victim of possible kidnapping and carjacking. Defendant Thomas was later questioned by a detective at the scene of the accident in his capacity as a victim. He was not under arrest, nor was he being interrogated as a potential defendant. At the time defendant Thomas gave his second version of events (i.e., that both he and the passenger were victims of a carjacking), defendant Thomas was not in custody, nor was he being "interrogated." The questions posed by the officers on the scene were not designed to elicit an incriminating response. See Miranda v. Arizona, 384 U.S. 436 (1966); Rhode Island v. Innis, 446 U.S. 291 (1980). The defendant's statements to the police officer were voluntary in nature. The defendant's statement was not in response to custodial interrogation nor is there any evidence that his will was overborne. Accordingly, there was no violation of Miranda or the Fifth Amendment privilege against self-incrimination with respect to his pre-arrest statements.

      B.      Defendant's Thomas's Statements after His Arrest Were
Not Involuntary or Otherwise in Violation of the Fifth and Sixth Amendment

As stated above, after Detective Trusdale read defendant Thomas his Miranda warnings, the defendant waived his Miranda rights and executed the PD-47 card. Defendant knowingly and voluntarily relinquish his right to decline to speak to the police, and that his statements were voluntarily made. The principal remaining issue is whether that waiver (and any subsequent statement) was knowing and voluntary. The record is clear on this issue: defendant's statements to the police were freely given following a knowing and voluntary waiver of his fifth amendment rights. Although the validity of the waiver is to be determined on a case-by-case basis by examining the totality of the circumstances, North Carolina v. Butler, 441 U.S. 369, 374-75 (1979), "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is

usually strong proof of the validity of the waiver. . . ."<u>Id</u>. A statement is voluntary for purpose of due process so long as the statements are "the product of an essentially free and unconstrained choice by its maker." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225-26 (1973) (citing <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961)). Moreover, for a statement to be involuntary, it must have been caused by government overreaching. <u>Colorado v. Connelly</u>, 479 U.S. 157, 163-64 (1986) ("[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law").

As the facts demonstrate, there was no overreaching in this case. Defendant was never threatened by the police and was never made any promises by the police. There is no allegation or evidence whatsoever of the police exerting any type of duress, physical, mental, or otherwise to obtain the statements or waiver from defendant Thomas. There is no evidence that defendant Thomas's will was overborne by police questioning. <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972). <u>See</u> <u>Rogers v. Richmond</u>, 365 U.S. 534, 544 (1961) (government conduct must be "such as to overbear [a suspect's] will to resist and bring about confessions not freely self-determined").

Defendant's age (32 at the time of his arrest), and his experience with the criminal justice system further support a finding of voluntariness. The record is devoid of any acts of police misconduct -- nor were any specific acts alleged by the defendant in his motion -- to suggest that his will was somehow overborne and that he was thus "forced" to give a statement or waive his Miranda rights.

Wherefore, the government respectfully requests that defendant Thomas's motion to suppress statements be denied.

                                          Respectfully Submitted,

                                          KENNETH L. WAINSTEIN
                                          UNITED STATES ATTORNEY

                                          _____/s/_____
                                          Lionel Andre
                                          Assistant United States Attorney
                                          Narcotics Section
                                          555 4th Street, N.W.
                                          Washington, D.C. 20001
                                          (202) 353-2481